ANNIE QUINTINI v. BOARD OF MAYOR AND ALDERMEN AND MARSHAL OF BAY ST. LOUIS.

1. CONSTITUTIONAL LAW. *Nuisance. Power of legislature to declare. Taking property without compensation.*
   The legislature has no authority to declare, or to authorize municipal authorities to declare, the building of a private residence on one's land to be a nuisance because the same may have a tendency to depreciate the value of adjoining property by shutting out the gulf breeze and obstructing the view to the sea, and thereby virtually deprive the owner of the use of his property without compensation.

2. SAME. *Power of legislature. Judicial functions.*
   The legislature cannot, constitutionally, declare that a given use of a particular tract or parcel of land is harmful and a nuisance. This would be exercising a judicial function.

3. CHANCERY COURT. *Jurisdiction to grant injunction to prevent suppression of alleged nuisance.*
   Where a particular use of property is declared by a municipal ordinance to be a

nuisance and also a crime, the chancery court still has jurisdiction to grant the owner an injunction against a suppression of the alleged nuisance, although its effect be to protect the owner from a criminal prosecution under such ordinance.

APPEAL from the Chancery Court of Hancock County.

HON. SYLVANUS EVANS, Chancellor.

The case is stated in the opinion of the court.

W. P. & J. B. Harris, for the appellant.

Can it be said that the legislature may give to a municipal body the power to prevent the enjoyment of a lot of ground by the owner by putting up a house on it to live in? What public right is abused or infringed by such use? It is a most unheard-of assumption that the right to put up a dwelling on one's own ground can be taken away. The use is of all uses the most lawful. It is not a common. It is not a public highway. It does not endanger health, property, or life. It would be a prohibition to use the property for any other purpose to which a town-lot might be used, so that the rights of property owners in towns or cities could be utterly destroyed. The act of 1882 did not give a power simply over erections for improper or hurtful uses, but to prevent the use of buildings for any purpose.

Is it conceivable that because in a city I happen to have a house fronting toward the shore, that an owner of ground between me and the sea cannot build on it, that people on a back street may have the houses between them and the sea torn down?

A dwelling-house is not a nuisance, it matters not which way the wind blows. A market-house for meats has never been held to be a nuisance, though a slaughter-pen may be. The city may limit the places where animals may be slaughtered and prevent the deposit of bones or offal within the inhabited parts. Sanitary regulations may embrace private sewerage and public sewerage, and even regulate privies, but to condemn the use of private property for dwellings because they must have water-closets is the climax of absurdity.

The legislature may give power to declare saloons a nuisance, as they affect public morality. It may suppress them altogether, so

it may curtail the imperfect right or custom of allowing cattle to roam at large, because this is not essential to their use. Certain trades may be nuisances in crowded cities—noxious trades. So trades not noxious but attended with great and painful noises, such as to affect materially the comfort not of one nervous or fantastic man or woman but a number of neighbors of the common sort, as Mr. Knight Bruce would say, but it will be in vain to search for an instance where a dwelling-house has been declared a nuisance because it was a house, on a private lot in a city.

If public taste is to be consulted, if the aspect would be more ornate by dedicating private property to the public for these objects, the city must seek it through the right of eminent domain or by purchase. It can acquire no power from any source to gratify these fancies by declaring innocent uses of property a nuisance. 1 Dillon on Mun. Corp. 383, § 379.

*Posey & Bowers,* for the appellees.

1. Appellant maintains that she has a right to build her market upon the beach and that the ordinance in question contravenes her right. On this point we specially call the attention of the court to the case of *Green* v. *Mayor, etc.,* reported in 6 Georgia Reports 1 and 12. The court there says.

" The plaintiff's rice, as we have shown, was planted in open violation of a public law of the city. * * * Can he be said to have a vested right in that which is unlawful, and prohibited by competent authority?" This question, so significantly propounded, seems to contain its own answer.

The ordinance there attacked was one prohibiting the growing of rice within the corporate limits of the city of Savannah. The court held it good and in so doing says :

" The plaintiff in error is not deprived of his land for the use of the public; he has not been evicted from it; he is only restrained from using it in a particular manner because such particular use operates as a nuisance and is destructive of public health." *Green* v. *Mayor of Savannah,* 6 Georgia 13. To the same effect see *Green* v. *Lake,* 60 Miss. 451 ; *Alexander* v. *Mayor,* 54 Miss. 659 ; 4 Wait's A. & D. 618 ; *Ferguson* v. *Selma,* 43 Ala. 398.

But granting, for the sake of argument, that appellant had a right that is contravened by this ordinance, was it not competent to do even that when expressly authorized by statute? Mr. Dillon so lays down the law. See 1 Dillon on Mun. Corp., 3 ed., § 325; Ib., § 328; Ib., § 375.

The legislature in express terms declares that buildings such as appellant is erecting (or, in fact, has erected while protected by this injunction) shall be nuisances. That is conclusive of one point. The legislature manifestly had the power to make such a declaration, and that declaration stamps such buildings as nuisances in the prohibited limits.

Even under the general police power, this municipal corporation has the power to regulate markets and assign limits to them, as affecting the public health, convenience, and comfort. Such powers have always been upheld as general and implied police powers.

2. But we come now to the minor question, whether upon the pleadings and evidence the injunction was properly dissolved.

We say that even on the face of the bill, if demurred to, the injunction should have been dissolved. The bill prays for an injunction against an inferior court, the mayor's court of Bay St. Louis, to restrain it from exercising its lawful jurisdiction, the trial of persons charged with violating an ordinance of the city.

A threat by an officer of the law that he will arrest a person if he persists in violating the law and bringing the alleged offender to trial before a court, cannot possibly be a ground for injunction.

COOPER, C. J., delivered the opinion of the court.

The appellant exhibited her bill in the Chancery Court of Hancock County to enjoin the board of mayor and aldermen of the town of Bay St. Louis from interference with her in the erection of a residence and market-house on a certain lot in that town of which she is the owner.

She avers the fact to be that on the lot there has existed a market-house for more than forty years, that she bought it for the purpose of keeping a market-house thereon, but finding the building old and decayed she took it down, and at considerable expense

has prepared it for another larger and better building, and was about to erect the same when the marshal of the town, acting under an ordinance of the town, forbade her from proceeding with the building, and threatened to arrest her and her workmen, whereby they were intimidated, and she has been unable to procure them to proceed with her improvements.

The municipal authorities, answering the bill, admit the facts charged by the complainant, and insist upon the validity of the ordinance by which buildings on lots situated as complainant's lot is are prohibited.

Reliance is placed by the defendants upon the peculiar location and character of the town as related to the lots referred to in the ordinance, and give this description of what is termed by its charter the " city of Bay St. Louis."

" Respondents further declare and show the fact to be that the city of Bay St. Louis is built for about eight miles along the western bank or shore of the Bay of St. Louis, and nearly all the residences are built along the water front of said bay, and facing east, commanding a beautiful view of said bay and of Mississippi Sound; that along said shore and between it and the said line of residences there is, and for many years has been, a hard shell road, an easy and beautiful drive and highway for carriages and vehicles, which is and for many years past has been kept in good condition at a large annual expense to said corporation ; that said city of Bay St. Louis is and for many years has been a famous and favorite summer resort, as a sanitarium, for health, recreation, and pleasure, and its real estate derives almost its whole value from this fact and from its commanding view of the waters of Mississippi Sound, and the fact that cool breezes habitually and daily blow from the Gulf of Mexico over this sound, and thus reach said residences and said shell road and drive, which in summer is daily covered with carriages and vehicles and persons on foot, who walk or drive along said shell road for their health and comfort and relief from the summer heat ; that the erection of buildings (except open summer-houses) between the said shell road and said shore obstructs and cuts off the view upon Mississippi Sound, it

obstructs the cooling and healthful breezes from the gulf, and creates heat and discomfort to the persons resident or sojourning in said city, and impairs their comfort and health; that the erection of residences and market-houses between said shell road and shore, necessarily and ordinarily by the uses thereof, create and engender uncleanliness, filth, and noxious, unwholesome, and disagreeable odors and smells, and impairs the health, convenience, and comfort of the public, the people residing or sojourning in said city." It is further said in the answer that the building contemplated to be erected by the complainant, " as a residence will contain a privy and a stable for horses immediately upon and under said shell road and highway of said city, and between said shell road and the shore of the bay, and that the prevailing winds blowing from the Gulf of Mexico to the said shell road and the residences on the west side thereof will be obstructed by said building, and said winds will come burdened with the noxious and disagreeable smells and odors of privies and horse stables, and the bones and horns of slaughtered cattle, etc. ; that the said corporation by its refusal to permit the erection of said building has exercised the discretion vested in it by its charter, and has adjudged such erection to be a nuisance."

The answer further avers that the complainant bought the property from its former owner with the intention of erecting thereon a building forbidden by the ordinance, and that the former owner sold the same to her for an insignificant price; that he had " tried to sell said lot of land to several persons, but they would not buy it because they could not use it *to any profit* without violating an ordinance of the town, and that complainant bought it with knowledge that she could not use it without violating said ordinance."

· The ordinance referred to is as follows :

" It is ordained by the board of mayor and aldermen of the city of Bay St. Louis that no person or persons shall build any house, or put up any shanties, huts, or erect any tents of any kind on the edge of the bank in front of said city between the road or street and the sea without a special permit from the board of mayor and aldermen, except such as are known and designated as

summer-houses, for shade only, and any houses built without such permission shall be considered as a nuisance."

By the charter of the town (Acts of 1882, p. 363) express authority was given the city authorities to enact the ordinance. By the act of March 16, 1886 (Acts of 1886, pp. 425 to 459), the charter of the town was amended, and by § 42 the power was given to the board of mayor and aldermen " to declare what shall constitute a nuisance in said city, and to prohibit, prevent, and abate the same, and in connection with all matters or things that are or may be hereafter declared as aforesaid to be a nuisance shall be included all shanties and other buildings now erected or may hereafter attempted to be erected on the beach side of the front street of said city when the same has a tendency to depreciate in value the property of persons near by, or in any manner obstruct the view of the same, or the breeze therefrom, the same being essential to the comfort, convenience, and good health of the occupants thereof; and any act done, or structure or thing erected or suffered, after it has been declared by said board of mayor and aldermen to be a nuisance, is hereby declared to be a nuisance, and shall be so held and considered by all the courts of this State as fully as if such act, thing, or structure were herein expressly named and prohibited."

Complainant's lot is within the forbidden ground, and the question presented is whether it is competent for the legislature to declare or to authorize the municipal authorities to declare private residences to be nuisances because the same " has a tendency to depreciate in value the property of persons near by, or in any manner to obstruct the view of the same, or the breeze therefrom."

With every inclination on our part to speak with due respect of any act which has received the approval of the legislative department of the Government, we can scarcely deal seriously with this legislative declaration of what is a nuisance. The absurdity of the proposition that one man's house becomes a nuisance because it obstructs the views of his neighbor across the street or intercepts a breeze which may blow from his point of the compass is rendered

doubly apparent when the act is applied to the city under consideration. According to the description given by its municipal officers, the city of Bay St. Louis consists (chiefly) of residences built along a street, or shell road, eight miles long, and upon the western side of the street. Along the eastern side of this street are situated numerous houses used by the owners and occupants as places of business, and so far as is shown by the record all the land between this road and the bay is the subject of private ownership. By one legislative decree this private property along the whole of one side of the principal street is swept out of beneficial existence because the use of it for any of the ordinary purposes of life has a tendency to depreciate that upon the other side by obstructing the view of the bay, or by intercepting the breezes which blow from the Mexican Gulf. There is scarcely, either in the answer or the evidence, a suggestion that the object of the ordinance and legislative declaration is other than to enhance the beauty of the street. The suggestion that the health of the town will be impaired by the obstructing of the health-giving breezes raises the pertinent inquiry, why they will not be equally obstructed by the residences on the other side of the street, and the fact that the view will be obstructed suggests the further question whether a view can be taken from one man because it can be enjoyed only from the rear of his house and conferred upon another, whose only superior equity is that it is unfolded in his front. The law can know no distinction between citizens because of the superior cultivation of the one over the other. It is with common humanity that legislatures and courts must deal, and that use of property which in all common sense and reason is not a nuisance to the average man cannot be prohibited because repugnant to some sentiment of a particular class. That the legislature in the exercise of the police power may prohibit in particular localities such use of property as is injurious to public health is admitted, and what it may do may also be authorized to be done by the local authorities, but it does not follow that it may by a mere declaration convert the harmless, proper, and ordinary use of property into a nuisance. Where the use of the land furnishes the test for the determination of the con-

stitutionality of the law, the legislature may not conclusively determine the effect to be harmful. This would be the assumption of judicial functions by the legislative department, and if yielded to by the courts would be an abrogation of those duties and powers committed by the constitution to the judicial department, and the untrammeled exercise of which is essential for the preservation of life, liberty, and property. *Hutton* v. *Camden*, 39 N. J. 122; Tiedeman on Police Powers 427.

The effect of the ordinance is to deprive the owners of property of its lawful use for a supposed public advantage, and before this can be done there must be just compensation first made.

The fact that in declaring buildings of the character in question nuisances the municipal authorities have also provided that persons who erect them may also be prosecuted in the courts of the town does not preclude relief by injunction. The ordinance, as we have said, is an attempted dedication of private property to public uses without due compensation first made, and this a court of chancery has jurisdiction to prevent. It is immaterial that the exercise of this power will, as a consequence, protect the owner from criminal prosecution.

Whether the owner of the property may keep a market thereon is not presented by this record. There is no ordinance of the town, so far as now appears, by which such use is forbidden. The prohibition is against the erection of any building on the lot, regardless of the use to which it may be put.

*The decree is reversed, the injunction reinstated, and the cause remanded.*